UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| DENICE LEE as next friend of J.S., a toddler, | |
| Plaintiff, | |
| v. | No. SA-18-CV-00605-JKP |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this Federal Tort Claims Act (FTCA) case, Plaintiff alleges: (1) J.S.'s treating physicians breached applicable standards of care when they failed to (a) provide an ASL interpreter; (b) take an adequate family history; (c) timely refer J.S. to a retinoblastoma specialist; and (2) said breach exacerbated the damage to J.S.'s vision. The Court convened a bench trial in this case October 26-30, 2020 and November 2, 2020. Pursuant to Fed. R. Civ. P. 52, the Court issues its findings of fact and conclusions of law.

**I. FINDINGS OF FACT**

1. J.S. was born on December 2, 2015 at Metropolitan Methodist Hospital in San Antonio to Denice Lee Lopez and Kendall L Smith.

2. Lee Lopez is deaf and requires an American Sign Language ("ASL") Interpreter to communicate with others.

3. Retinoblastoma, or RB causes tumors to form in the developing retina.

4. RB can lead to significant visual impairment.

5. A red reflex test of the eyes can detect irregularities in the retina, a warning sign for RB.

6. A red reflex test is routinely conducted at well child visits.

7. Very few children are referred to a pediatric ophthalmologist based on the results of a red reflex text.

8. Physicians generally agree that the red reflex test is unreliable, but, at present, it is the only non-invasive test widely available.

9. RB is extremely rare: fewer than 500 new cases a year are diagnosed in the United States, uniformly affecting children.

10. There is no established growth chart or published study that is used to predict the rate at which RB tumors grow.

11. A child with a family history of RB has an approximately fifty percent chance of developing RB tumors.

12. Smith has the heritable form of retinoblastoma. Smith lost an eye to RB.

13. If a parent of a child has heritable retinoblastoma, the child should be immediately referred to a specialist.

14. RB tumors cause damage to the retina when they form. The negative impact to vision is increased when RB tumors form in the macula.

15. A common classification system for grading RB tumors is on a scale of A-E. Using this system, tumors are classified based on size and other characteristics. Broadly, group A tumors are smallest and group E tumors are largest.

16. Communicare S.A. is a private health center with a campus in San Antonio.

17. At all times relevant to this case, Communicare S.A. received federal funds and was a "deemed" entity in accordance with the Federally Supported Health Centers Assistance Act of 1992. *See* 42 U.S.C. § 233.

18. While Communicare S.A. and its employees are not federal employees, they are considered to be federal employees for purposes of the FTCA.

19. Dr. Richard Switzer, MD, is a pediatrician employed by Communicare S.A.

20. Lee Lopez's prenatal obstetric care was provided by Communicare S.A. Communicare was aware of the family history of RB. Communicare referred Lee Lopez to a geneticist who recommended amniocentesis to test for the RB gene. After she was informed of the risks, Lee Lopez declined amniocentesis. J.S.'s cord blood could have been tested for the RB gene but was not.

21. Dr. Switzer was notified of J.S.'s birth and conducted his first physical examination of J.S. on December 3, 2015. While Dr. Switzer did not have direct access to Lee Lopez's medical chart

or records, he testified that the hospital nurses often tell him medical information about the mother that may impact a newborn, such as that a mother has lupus. Dr. Switzer testified that he relies on the nurses at the hospital to tell him this kind of information. He also has access to the mother's prenatal record for items such as a screening for syphilis, group B strep, or chlamydia, a urine drug screen, or whether Child Protective Services is involved. Dr. Switzer also testified he receives the hospital discharge summary from the parent and asks the parent to sign a release for him to obtain the summary if the parent does not bring the discharge summary to the child's first check-up.

22. J.S. was seen at Communicare by Dr. Richard Switzer on December 11, 2015, and December 16, 2015. J.S. was seen at Communicare by pediatric nurse practitioner Lise Jamison on February 10, 2016. J.S. was seen at Communicare by Dr. Patricia Juarez on April 15, 2016.

23. Lee Lopez requested an ASL interpreter be present at all of J.S.'s Communicare appointments. Communicare did not provide an ASL interpreter for the December 11, 2015, December 16, 2015, February 10, 2016, or April 15, 2016 visits.

24. Lee Lopez and Smith testified that Smith was present at the December 11, 2015, December 16, 2015, and February 10, 2016 visits. And that Smith interpreted for Lee Lopez. Smith testified that at the December 11, 2015 visit Dr. Switzer did not ask any questions about Smith's medical history. Rather, Smith told Dr. Switzer about his hearing impairment and his RB. Smith further testified that he told Dr. Switzer that he was concerned that J.S.'s left eye "was a little off." Smith testified he repeated his concerns about J.S.'s eye to Dr. Switzer at the December 16, 2015 visit. At both visits, Dr. Switzer told Smith that it is common for a baby at that age to have a weak eye muscle and that it would improve over time. Neither Smith nor Lee Lopez was questioned about specifics of the February 10, 2016 visit.

25. At the April 15, 2016 visit, Dr. Juarez and Lee Lopez communicated by writing. Based on Dr. Juarez's physical exam of J.S. and information from Lee Lopez, Dr. Juarez referred J.S. to an RB specialist.

26. On April 22, 2016, RB specialist Dr. Amy Schefler examined J.S. and diagnosed him with bilateral retinoblastoma. Dr. Schefler classified the tumors in J.S.'s eyes as group C.

27. Since his diagnosis, J.S. has received medical care, including examinations under anesthesia and chemotherapy, cryotherapy, and laser therapy to treat his retinoblastoma.

28. In J.S.'s medical records, Dr. Schefler characterized J.S.'s response to treatment as "outstanding."

29. Dr. George Nathanial McGrath, Defendant's expert, testified that based on his review of the medical records, J.S.'s retinoblastoma tumors have been successfully treated. Dr. McGrath testified that based on a recent study, the chance of a recurrence in J.S. is less than two percent. Dr. David A. Plager, Plaintiff's expert, testified that in practice, doctors are generally not good at predicting whether a patient will have a recurrence. The experts agreed that at this stage in J.S.'s

treatment, the standard of care is regular observation to identify any new tumors or secondary cancers and prompt treatment thereof.

30. Because of the location of the tumor in J.S.'s left eye, his macula and the corresponding central vision have been irrevocably damaged. Additionally, J.S.'s left eye drifts. Surgery has been recommended to improve the ocular alignment of J.S.'s left eye. Such surgery will not improve his vision.

31. On February 4, 2020, while wearing glasses, the vision in J.S.'s right eye measured 20/20. The tumors in J.S.'s right eye caused a significant blind spot. The impact of the blind spot will not be fully known until J.S. is older and can articulate his visual acuity.

32. Because of the heritable nature of J.S.'s retinoblastoma, there is a risk for developing new tumors and secondary cancers.

33. J.S. remains under regular observation to identify and treat any new tumors, and will likely remain so throughout his adolescence, if not his entire life.

## II. CONCLUSIONS OF LAW

Any finding of fact herein above which also constitutes a conclusion of law is adopted as a conclusion of law. Any conclusion of law herein made which also constitutes a finding of fact is adopted as a finding of fact.

1. This Court has jurisdiction to hear this case under the Federal Tort Claims Act. *See* 28 U.S.C. §§ 1346(b), 2671 *et seq.*

2. Venue is proper in the United States District Court for the Western District of Texas.

3. Plaintiff has complied with the administrative requirements of the FTCA.

4. Plaintiff has the burden of proof by a preponderance of the evidence. "To establish by a preponderance of the evidence means to prove something is more likely so than not so." Plaintiff must prove every essential element of each claim by a preponderance of the evidence. Burden of Proof: Preponderance of the Evidence 3.2, Fifth Circuit Pattern Jury Instruction (2020).

5. The United States is liable for its torts if a private person would be liable for the same act or omission under local laws. 28 U.S.C. § 1346(b); 28 U.S.C. §§ 2671 *et seq.* Under the FTCA, liability for medical malpractice is controlled by state law, the law of Texas in this case. *Ayers v. United States*, 750 F.2d 449, 452 n.1 (5th Cir. 1985).

6. To prove an action for negligence in a medical malpractice action, the plaintiff must prove: "(1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury, and (4) a causal connection between the breach of care and the injury." *Quijano v. United States*, 325 F. 3d 564, 567 (5th Cir. 2003) (citing *Mills v. Angel*, 995 S.W.2d 262, 267 (Tex. App.-- Texarkana 1999, no. pet.); *Denton Reg. Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex. App.--Fort Worth 1997, no pet.)).

7. To establish breach of a duty, the plaintiff must establish an applicable standard of care. *Quijano*, 325 F. 3d at 567 (citations omitted). "Expert testimony is generally required to prove the applicable standard of care." *Id.* (citations omitted).

8. Drs. Plager and McGrath testified that the standard of care for a child with no known family history of retinoblastoma requires administering the red reflex test at every well child visit, even though the red reflex text is unreliable. For a stable infant with a known family history of retinoblastoma, the standard of care requires immediate referral to a pediatric ophthalmologist and evaluation by a pediatric ophthalmologist within the first four weeks of life.

9. The doctors testified that once referred, the typical treatment plan is to conduct regular examinations—often under anesthesia—until tumors form. If tumors form, treatment includes various modalities of chemotherapy, cryotherapy, and laser therapy.

10. The experts agreed that the location of a tumor is highly determinative of a patient's visual outcome. Tumors that form in the macula, or central vision area, have a bigger impact on vision than tumors that develop in the periphery. A child with a large tumor outside the macula may still have good vision; a small tumor in the central vision area can cause significant vision loss.

11. Dr. Plager testified that in thirty years of evaluating children with RB, he had not seen tumors initially form in the macula later than the first two weeks of life. In other words, if RB tumors were present in a two-week-old child—but no tumors in the macula—he felt comfortable telling that family that a macular tumor will not form. Based on his experience treating children with RB, Dr. Plager concluded that J.S.'s macular tumor "more than likely occurred in the first couple of weeks."

12. Dr. McGrath testified that he had a patient referred to him at four and one-half months. This patient's left eye was "full of cancer" and, after chemotherapy, had to be removed (enucleated). Three months after Dr. McGrath enucleated the left eye, a macular tumor developed in the right eye. Dr. McGrath therefore disagreed with Dr. Plager's conclusion that if a macular tumor did not form in the first few weeks of life, he could assure a family that a macular tumor would not form.

13. While the experts disagreed on when macular tumors *might* form, neither could predict to a reasonable degree of medical probability when an RB tumor *will* form, nor could they estimate how long an already-formed tumor had been growing.

14. Having considered the weight and credibility of the testimony, the documentary evidence, and the parties' respective arguments, this Court finds that Plaintiff has proven by a preponderance of the evidence that Dr. Switzer breached the duty of care owed to J.S. by failing to record the medical history provided by Smith and by failing to immediately refer J.S. to a pediatric ophthalmologist upon learning that Smith had RB. While the prudent approach would have been to provide an ASL interpreter, Dr. Juarez obtained family medical history and immediately referred J.S. to a pediatric ophthalmologist without an interpreter present. Thus, the Court cannot find that any duty of care was breached by failing to provide an ASL interpreter.

15. Because Plaintiff could not establish through expert testimony to a reasonable degree of medical probability (1) when J.S.'s RB tumors developed or (2) an established growth rate for RB tumors, it is impossible to tell from the medical evidence whether the delay in diagnosis exacerbated the damage to J.S's vision. Accordingly, this Court finds that Plaintiff has not proven by a preponderance of the evidence a causal connection between the breach of the standard of care and the injury. While the Court recognizes it is possible J.S. might have had a better outcome if he had been referred to a pediatric ophthalmologist sooner, Plaintiff did not establish that it is more likely than not that earlier detection of J.S.'s retinoblastoma would have improved his outcome.

### III. CONCLUSION

In accordance with these findings of fact and conclusions of law, the Clerk is instructed to enter a judgment that Plaintiff take nothing on her claims.

It is so ORDERED this 4th day of January 2021.

JASON PULLIAM
UNITED STATES DISTRICT JUDGE